UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

DEBORAH HOUSE,

                Plaintiff,

     -against-                        7:15-CV-1064 (LEK)

COMMISSIONER OF SOCIAL
SECURITY,

                Defendant.

## MEMORANDUM-DECISION AND ORDER

### I.    INTRODUCTION

This case has proceeded in accordance with General Order 18, which establishes the

procedures applicable to appeals from denials of Social Security benefits. Both parties have filed

briefs. Dkt. Nos. 13 ("Plaintiff's Brief"), 14 ("Defendant's Brief"). For the following reasons, the

determination of the Social Security Administration ("SSA") is affirmed.

### II.    BACKGROUND

#### A.  Plaintiff's Disability Allegations

Plaintiff Deborah L. House was born on August 31, 1966. Dkt. No. 9 ("Record") at 8. She

currently lives with her daughter and three grandchildren. Id. at 157. House claims to suffer from

a broad range of ailments, including "chronic obstructive pulmonary disease, chronic bronchitis,

fibromyalgia, allergies, obstructive sleep apnea, obesity, depression, low[er] back pain, migraine

headaches and myofascial pain syndrome." Pl.'s Br. at 1. As a consequence of these conditions,

House argues that she is disabled and incapable of working, with a disability onset date of

January 1, 2009. Id.

House has a twelfth-grade education, along with some college coursework and a certificate in food service. R. at 146. House's last employment was from 2005 until sometime between late 2008 and January 2009, when she worked as a cashier at Stewart's Shops in Ogdensburg. Id. at 146–47, 149–50, 285, 294. Her employment at Stewart's apparently ended when she was fired for improper charging of food she ate on the job. See id. at 149–50. After leaving Stewart's, House claims she did not work again due to "trouble with [her] back," fibromyalgia, and because her "knees started going." Id. at 150. Before her work at Stewart's, House held a number of unrelated jobs, including cemetery plot salesperson, home health aide, and babysitter. Id. at 147–49.

Primarily at issue in this appeal are three of House's alleged medical conditions: fibromyalgia, carpal tunnel syndrome, and migraines/headaches. The medical records concerning each of these conditions are discussed below.

### 1. Fibromyalgia

On December 8, 2009, Dr. Juan-Diego Harris—a pain management specialist affiliated with St. Lawrence Health Alliance and Claxton-Hepburn Medical Center—saw House on December 8, 2009, for "[m]anagement of diffuse pain." Id. at 518. After discussing House's symptoms, Dr. Harris wrote, "This is a woman with significant chronic diffuse pain of an unclear etiology. Possible diagnoses include fibromyalgia. On today's examination, she meets this diagnosis as per the American Academy of Rheumatology." Id. at 519; see also id. (discussing House's "[s]ignificant myofascial tender points"). Dr. Harris noted the same impression regarding fibromyalgia on January 21, 2010. Id. at 517. On March 9, May 18, August 3, and October 5, 2010, and March 18 and June 8, 2011, Dr. Harris again noted that "[p]ossible

2

diagnoses include fibromyalgia," but omitted the portion about her meeting any specific diagnostic standards. Id. at 510–16. In several of his reports, Dr. Harris also noted mid back pain that he described as "[m]yofascial in nature," and also that House's pain was under "[f]air control." E.g., id. at 513.

On May 27, 2011, Dr. David Schaefer of Claxton-Hepburn noted that House was "positive for fibromyalgia." Id. at 365. On October 26, 2011, another doctor at Claxton-Hepburn—Dr. Mohammad Vakil—also diagnosed House with fibromyalgia. Id. at 369; see also id. at 393 (noting fibromyalgia in House's past medical history). In her social security papers, House stated that she was prescribed cyclobenzaprine—a muscle relaxer also known as Flexeril—for her fibromyalgia, id. at 339, which is confirmed by her past medical notes, e.g., id. at 365, 372. On November 9, 2011, treatment notes from Heuvelton Health Center—a subsidiary of Claxton-Hepburn—noted "no new changes" with House's fibromyalgia and chronic pain. Id. at 436.

On November 28, 2011, nurse practitioner Mylene Jumalon saw House on "a follow up evaluation for management of back pain and overall body pain." Id. at 508. On January 25, 2012, NP Jumalon again saw House and noted that a "[p]ossible diagnosis is fibromyalgia," but that the "criteria [for fibromyalgia] was not met on today's visit." Id. at 507. On July 11, 2012, Dr. Harris noted that House had "significant pain in multiple areas of her body," and that "[s]he basically shades the whole pain diagram." Id. at 505. Dr. Harris stated that House had "significant, chronic, diffuse pain," and that "[f]ibromyalgia is a working diagnosis." Id. As a plan of treatment, Dr. Harris wrote that House was to continue her use of cyclobenzaprine along with tramadol (an opioid). Id.

At a consultative medical examination on October 24, 2012, Dr. Justine Magurno diagnosed House with fibromyalgia. Id. at 567. In discussing House's past diagnosis of fibromyalgia and House's complaints, Dr. Magurno stated that "[i]t is difficult to find specifically what the problem is, but [House] states she cannot walk a lot. She has pain on touch." Id. at 563. In examining House for fibromyalgia, Dr. Magurno found that "[t]he following tender points [were] positive: Trapezius, scapular, and bilateral knees for a total of 6 out of 18." Id. at 567.

On January 17, 2013, House again saw NP Jumalon, who noted that fibromyalgia was a possible diagnosis, but that House did not then meet the diagnostic criteria. Id. at 676. On April 11, May 24, August 23, and November 27, 2013, NP Jumalon said that House "ha[d] no significant tender points at [those] visit[s]." Id. at 677–81.

On September 10, 2013, a physical therapist at Canton Potsdam Hospital conducted an evaluation and noted House's diagnosis of fibromyalgia. Id. at 650. Similarly, on February 26, 2014, NP Jumalon listed House's diagnosis in a medical source statement as "generalized pain syndrome." Id. at 669; see also id. at 683, 688 (showing an endorsement of this document by Dr. Harris). In the same document, NP Jumalon stated that House's pain is either "present to such an extent as to be distracting to adequate performance of daily activities or work," or "incapacitating to the patient." Id. at 674. On that same day, however, NP Jumalon's treatment notes again noted that House had no significant tender points. Id. at 682.

### 2. Carpal Tunnel Syndrome

On April 14, 2011, House visited Heuvelton and complained of "numbness from her right elbow to her right hand on and off." Id. at 441. House claimed that she could not hold coffee due

to the numbness in her arm, and that this was "progressively getting worse" over a six-month period. Id. On July 11, 2012, House saw Dr. Harris at Heuvelton, who noted that House complained of "right shoulder pain," resulting in a "decreased range of motion, radiating pain to the elbow including numbness in the fingers and muscle spasms for two to three weeks." Id. at 505. Dr. Harris described this shoulder pain as resulting from "tendonitis/bursitis." Id. At another visit on July 18, 2012, NP Jumalon noted House's complaint that "her arms and hands get[] numb occasionally" and that "it is getting harder to pick up things." Id. at 506. Discussing this complaint, NP Jumalon said that House was "somewhat positive for Phalen's test, but not for Tinel's test," and that she had "5/5 motor strength equal bilaterally in the upper and lower extremities." Id. Later in the same notes, NP Jumalon wrote, "New complaints of paresthesias on bilateral upper extremities with positive Phalen's test, but negative Tinel's test. She might have some mild carpal tunnel syndrome." Id.

At the October 24, 2012 consultative medical examination, Dr. Magurno diagnosed House with tendonitis of the right shoulder. Id. at 568. After noting House's complaint that "[h]er right hand goes numb," Dr. Magurno found that reaching was "mildly limited on the right" and that her right-side grip strength was somewhat reduced, but that her "[h]and and finger dexterity [were] intact" and there were "[n]o limitations for fine motor skills." Id. at 563, 567–68. On September 10, 2013, a physical therapist at Canton Potsdam Hospital saw House for pain in her back and right shoulder, during which she noted that House complained of "numbness in her [right] hand which may be carpal tunnel syndrome." Id. at 650.

On January 14, 2013, House visited Heuvelton and saw physician's assistant Allison Latham and/or Dr. Kelly Scott, both of whom signed a report stating that House complained of

"chronic right hand pain and numbness." Id. at 775. PA Latham and Dr. Scott ordered a nerve conduction study and a follow-up visit. Id. At the follow up after her nerve conduction study, House continued to complain of wrist pain, and the notes from the follow up state that House "showed early carpal tunnel syndrome involvement of the median sensory fibers of the wrist." Id. at 776.

On February 26, 2014, in a medical source statement, NP Jumalon described House as being limited in her ability, and only occasionally able, to reach, handle, finger, and feel using her right hand. Id. at 672. Another version of this document was endorsed by Dr. Harris. Id. at 683–87.

### 3. Migraines/Headaches

On November 11, 2009, House visited Heuvelton complaining of severe headaches, a symptom she first experienced several years prior and that since returned. R. at 751. A nurse practitioner there prescribed "Relpax 40 mg . . . [to be used at] the first sign of migraine." Id. House was also "encouraged to [instead] use 800 to 1000 mg of ibuprofen, a one-time dose with food before the Relpax and see if she can control migraine." Id. On October 4, 2010, a report signed by both PA Latham and Dr. Scott noted that House had "[n]o recent complaints" of migraines. Id. at 755. Several other reports from Heuvelton listed migraines within her past medical history, but mentioned no current complaints of migraines or headaches, in some cases denied headaches, and prescribed no medication for them. See, e.g., id. at 437, 439, 758, 762. An MRI of House's brain appeared normal. Id. at 413. At the October 24, 2012 consultative medical examination, Dr. Magurno diagnosed House with migraines and noted that they may cause "moderate schedule disruptions." Id. at 568.

## B. Procedural History and the SSA's Decision

House first applied for disability benefits on July 11, 2012. Id. at 269. On November 1, 2012, her application was denied, id. at 190–91; see also id. at 194–98, and House requested a hearing with an administrative law judge ("ALJ"), id. at 210. Her case was assigned to ALJ Edward I. Pitts, who held a hearing by videoconference on April 1, 2014. Id. at 143. At the hearing, ALJ Pitts and House's counsel asked House questions concerning her employment history, medical conditions, and ability to function. Id. at 143–75.

ALJ Pitts then questioned Robert Baker, a vocational expert, in order to solicit an opinion about employment prospects for someone with House's limitations. Id. at 175–80. The ALJ presented VE Baker with the following hypothetical:

> I want you to consider a person of the same age as the claimant. In this case, she is a younger individual between the ages of 42 and 47, has the same past relevant work that you have just identified, has a high school diploma, but no additional training. I want you to consider that this person is capable, generally, of the activities of sedentary work. However, they would need to periodically shift from sitting to standing. They would have to do that every 30 to 40 minutes, but they can do it while remaining on task and at the work station. Because of the claimant's breathing problems, [she] needs to avoid concentrated exposure to respiratory irritants and extremes of temperature. Otherwise, is limited to the activities of unskilled work due to her depression.

Id. at 178–79. VE Baker then opined that jobs existed in the national economy that would accommodate someone with the limitations in the ALJ's hypothetical. Id. at 179–80.

In response, House's counsel asked Baker to consider a hypothetical largely identical to the one presented by ALJ Pitts, but that limits the person to occasional reaching, handling, fingering, and feeling on the right side, and occasional handling, fingering, and feeling on the left

side. Id. at 181–82. Focusing on the right hand (House's dominant hand), Baker opined that the limitation on reach, handling, fingering, and feeling would leave no jobs available in the national economy. Id. at 182. The ALJ then asked follow-up questions of Baker and House concerning the potential limitations of her right hand. Id. at 182–86.

On May 2, 2014, ALJ Pitts issued a decision finding that House was not disabled under the Social Security Act. Id. at 110–35. Progressing through the five-step process for determining disability under SSA regulations (discussed below in Part III.B), ALJ Pitts first found that House was not currently engaged in gainful employment, a threshold question for determining disability. See id. at 115–16. Next, the ALJ found that House had several severe and medically determinable impairments, namely "chronic obstructive pulmonary disease, chronic bronchitis, allergies, obstructive sleep apena, tobacco abuse syndrome, obesity, depression, and myofascial pain syndrome." Id. at 116. Notably for this appeal, however, ALJ Pitts also found several conditions to either not be severe or not be medically determinable.

In finding House's complaints of migraines not to constitute a severe impairment, the ALJ pointed to the existence of House's migraine complaints from when she was still gainfully employed (suggesting that the condition was not sufficiently severe so as to prevent work), her treatment using over-the-counter analgesics and other conservative options, a normal brain MRI, and House's specific denial of headaches or migraine symptoms in several treatment notes. Id. at 117. Next, without opining on the severity of the condition, ALJ Pitts found House's carpal tunnel syndrome complaints not to be medically determinable, as "none of the acceptable medical sources confirmed a diagnosis for carpal tunnel syndrome" and testing yielded only equivocal results. Id. at 119. ALJ Pitts also found that the diagnosis for fibromyalgia was not

medically determinable, stating that "[t]he claimant's pain management specialist only occasionally reported a diagnosis of fibromyalgia and the rheumatologist did not confirm the diagnosis based on repeat exams of the claimant." Id. Additionally, "[t]here was no identification of 11 or more of the 18 tender points generally associated with fibromyalgia." Id.

For House's claims of fibromyalgia and carpal tunnel syndrome, even though the ALJ did not find these conditions to be medically determinable, he still considered their symptoms when determining House's continued ability to work. See id. Because these conditions were not found to be serious and medically determinable, however, the ALJ apparently did not consider whether they required a finding that House was disabled per se. See id. at 119–22; see also 20 C.F.R. § 404.1520(a)(4)(ii)–(iii) (describing these stages of the disability evaluation).

Later in his decision, ALJ Pitts found that—in light of her symptoms—House possessed an ability to work that was effectively identical to the hypothetical he posed to the vocational expert at the hearing. See R. at 122. Included in this assessment is the ALJ's belief that, even though House would "need[] to periodically shift from sitting to standing every 30-45 minutes" while working, she would be able to do this "while remaining on task and at the workstation." Id. Based on the vocational expert's opinion that such a person would be able to find work in the national economy, ALJ Pitts found that House was not disabled under the Social Security Act. Id. at 133–35.

Following the ALJ's decision, House sought review of her case by the SSA's Appeals Council. Id. at 65–68. On July 31, 2015, however, the Appeals Council denied House's request for review. Id. at 1.

**C. This Appeal**

On September 28, 2015, House initiated this appeal by filing her Complaint. Dkt. No. 1. In her brief, House makes two main arguments as to why the ALJ erred in his decision that she was not disabled. Her first argument is that the ALJ should have found her fibromyalgia, carpal tunnel syndrome, and migraines to all be severe and medically determinable impairments. Pl.'s Br. at 15. House appears to argue that the ALJ's findings on this point were not supported by substantial evidence, <u>see id.</u> at 15–19, and also that the ALJ failed to give controlling weight to the findings of House's treating physicians, as is required by regulations, <u>see id.</u> at 19–23. House's second argument is that the ALJ's finding regarding her need "to periodically shift from sitting to standing" was flawed because the ALJ assumed she would be able to "remain[] on task and at the workstation." R. at 122; Pl.'s Br. at 23–25. According to House, the ALJ's finding on this point was not supported by substantial evidence, and ignored contrary evidence suggesting House's inability to remain concentrated and focused on her work. Pl.'s Br. at 24–25. Each of these arguments is addressed in turn below.

## III. LEGAL STANDARD

### A. Standard of Review

When a court reviews a final decision by the SSA, it determines whether the ALJ applied the correct legal standards and whether the decision is supported by substantial evidence in the record. 42 U.S.C. § 405(g); <u>Roat v. Barnhart</u>, 717 F. Supp. 2d 241, 248 (N.D.N.Y. 2010) (Kahn, J.) (citing <u>Berry v. Schweiker</u>, 675 F.2d 464, 467 (2d Cir. 1982)). Substantial evidence amounts to "more than a mere scintilla," and it must reasonably support the decision maker's conclusion. <u>Halloran v. Barnhart</u>, 362 F.3d 28, 31 (2d Cir. 2004) (quoting <u>Richardson v. Perales</u>, 402 U.S.

389, 401 (1971)). The Court defers to the ALJ's decision if it is supported by substantial

evidence, "even if [the Court] might justifiably have reached a different result upon a de novo

review." Sixberry v. Colvin, No. 12–CV–1231, 2013 WL 5310209, at *3 (N.D.N.Y. Sept. 20,

2013) (quoting Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir.

1984)). However, the Court should not uphold the ALJ's decision when there is substantial

evidence, but it is not clear that the ALJ applied the correct legal standards. Johnson v. Bowen,

817 F.2d 983, 986 (2d Cir. 1987).

### B. Standard for Benefits

According to SSA regulations, disability is "the inability to do any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than 12 months." 20 C.F.R. § 404.1505(a). However, an individual seeking disability

benefits "need not be completely helpless or unable to function." De Leon v. Sec'y of Health &

Human Servs., 734 F.2d 930, 935 (2d Cir. 1984) (quoting Gold v. Sec'y of Health, Educ. &

Welfare, 463 F.2d 38, 41 n.6 (2d Cir. 1972)).

In order to receive disability benefits, a claimant must satisfy the requirements set forth in

the SSA's five-step sequential evaluation process. 20 C.F.R. § 404.1520(a)(1). In the first four

steps, the claimant bears the burden of proof; at step five, the burden shifts to the SSA. Kohler v.

Astrue, 546 F.3d 260, 265 (2d Cir. 2008) (quoting Perez v. Chater, 77 F.3d 41, 46 (2d Cir.

1996)). If the SSA is able to determine that the claimant is disabled or not disabled at any step,

the evaluation ends. 20 C.F.R. § 404.1520(a)(4). Otherwise, the SSA will proceed to the next

step. Id.

At step one, the SSA considers the claimant's current work activity to see if it amounts to "substantial gainful activity." Id. § 404.1520(a)(4)(i). If it does, the claimant is not disabled under SSA standards. Id. At step two, the SSA considers whether the claimant has a severe and medically determinable physical or mental impairment—or a combination of impairments that is severe—that meets the duration requirement in 20 C.F.R. § 404.1509. Id. § 404.1520(a)(4)(ii). If he or she does not have such an impairment, the claimant is not disabled under SSA standards. Id. At step three, the SSA considers the severity of the claimant's medically determinable physical or mental impairment(s) to see if it meets or equals an impairment and the requisite duration listed in 20 C.F.R. pt. 404(P), app. 1. Id. § 404.1520(a)(4)(iii). If it meets one of these listed impairments and durations, the claimant is disabled.

If, following step three, no disability determination has been made, the SSA must determine the claimant's residual functional capacity ("RFC"), meaning the most work the claimant is able to do given her impairments and other limitations. Id. §§ 404.1520(e), 404.1545. Then, under step four, the claimant is not disabled if the RFC reveals that the claimant can perform her past relevant work. Id. § 404.1520(a)(4)(iv). If the claimant cannot perform any past relevant work, the SSA decides at step five whether adjustments can be made to allow the claimant to work somewhere in a different capacity. Id. § 404.1520(a)(4)(v). If appropriate work does not exist, then the SSA considers the claimant to be disabled. Id.

## IV.  DISCUSSION

### A.  Plaintiff's Severe Impairments

As noted above, House challenges three of the ALJ's step two determinations regarding which of her impairments were severe and medically determinable. Pl.'s Br. at 15–19.

Specifically, House claims that the ALJ's decisions concerning the severity and determinability of House's fibromyalgia, carpal tunnel syndrome, and migraines were not supported by substantial evidence, see id., and that the ALJ should have given controlling weight to the diagnoses of House's treating physicians, see id. at 19–23.

At the outset, it is unclear how the ALJ's decisions on this point could have affected the disability determination, since the ALJ found several other impairments to be severe and medically determinable, pushing House past step two of the review process outlined above. See R. at 116; see also 20 C.F.R. § 404.1520(a)(4)(ii). Furthermore, the ALJ still considered the symptoms associated with these conditions when determining House's RFC, see R. at 119, 122–32, and House did not argue on appeal that any of these three conditions would have met or equaled one of the listed impairments considered at stage three of the disability analysis, see Pl.'s Br.; see also 20 C.F.R. § 404.1520(a)(4)(iii). This alone is sufficient grounds to affirm the ALJ's decision. See, e.g., Calixte v. Colvin, No. 14-CV-5654, 2016 WL 1306533, at *23 (E.D.N.Y. Mar. 31, 2016) ("Where an ALJ excludes certain impairments from the list of severe impairments at the second step, any such error is harmless where the ALJ identifies other severe impairments such that the analysis proceeds and the ALJ considers the effects of the omitted impairments during subsequent steps." (citing O'Connell v. Colvin, 558 F. App'x 63, 64–65 (2d Cir. 2014))). Furthermore, House's arguments also fail on the merits, and the step two determinations of the ALJ must be affirmed.

### 1. Fibromyalgia

In his decision, ALJ Pitts found that House's fibromyalgia diagnosis was not medically determinable. R. at 118–19. He based this finding on the facts that "[t]he claimant's pain

management specialist only occasionally reported a diagnosis of fibromyalgia," "the rheumatologst did not confirm the diagnosis based on repeat exams of the claimant," and that "[t]here was no identification of 11 or more of the 18 tender points generally associated with fibromyalgia." Id. at 119. House objects to these findings, citing to past diagnoses of fibromyalgia, identification of several tender points (though never as many as eleven), and House's complained-of symptoms as proof that ALJ Pitts's determination could not have been supported by substantial evidence. See Pl.'s Br. at 16–18.

To be medically determinable, physical impairments "must be established by medical evidence consisting of signs, symptoms, and laboratory findings." 20 C.F.R. § 404.1508. The SSA has also issued a Social Security Ruling ("SSR") containing specific criteria for deciding whether a diagnosis of fibromyalgia is medically determinable. SSR 12-2p, 2012 WL 3104869 (July 25, 2012). Under that SSR, a claimant will be found to have a medically determinable impairment if a physician diagnoses her with fibromyalgia and provides evidence justifying the diagnosis under one of two sets of criteria. Id. at *2. Under the criteria relevant to this case—the 1990 American College of Rheumatology ("ACR") Criteria for the Classification of Fibromyalgia—the claimant would need to provide evidence showing "[a] history of widespread pain," that there are "[a]t least 11 positive tender points on physical examination" (meaning points on which the application of pressure is painful), and "[e]vidence that other disorders that could cause the symptoms or signs were excluded." Id. at *2–3.[1]

_____

[1] The SSR also allows a claimant to establish fibromyalgia using the 2010 ACR Preliminary Diagnostic Criteria. SSR 12-2p, 2012 WL 3104869, at *3. While the ALJ appears to have ignored this possibility, see R. at 119, House did not raise this issue in her brief, see Pl.'s Br.; see also Whipple v. Astrue, 479 F. App'x 367, 370 (2d. Cir. 2012) ("[Plaintiff] failed to raise this claim before the magistrate judge or the district court. We therefore deem the issue

Dr. Harris's notes that House "meets this diagnosis [of fibromyalgia] as per the American Academy of Rheumatology" in December 2009 and January 2010, R. at 517, 519, even assuming he meant the American College of Rheumatology's criteria, are insufficient to provide the specific evidence required to establish fibromyalgia as a medically determinable impairment, see SSR 12-2p, 2012 WL 3104869, at *2 ("We will find that a person has an MDI of FM if the physician diagnosed FM *and provides the evidence we describe . . . .*" (emphasis added)). None of Dr. Harris's notes established the number of tender points as required by the SSR, see R. at 510–19, and Dr. Magurno—the consultative examiner—found House positive for six out of the eighteen relevant tender points, as opposed to the required eleven, see id. at 567. Given that the burden of showing the existence of a severe and medically determinable impairment rests with the claimant, e.g., Woodmancy v. Colvin, 577 F. App'x 72, 74 (2d Cir. 2014); see also 20 C.F.R. § 416.1512(a), the evidence mentioned here—and the lack of evidence meeting the SSR's criteria for fibromyalgia—is sufficient to support the ALJ's decision with substantial evidence, see, e.g., Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002) ("'Substantial evidence' means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" (quoting Richardon v. Perales, 402 U.S. 389, 401 (1971))).

While House may be correct in noting the ALJ's error in referring to the examinations of a rheumatologist, since House apparently was not seen by one, see Pl.'s Br. at 16–17 (citing R. at 119), this error was harmless because the determination that House's fibromyalgia was not medically determinable is dependant upon the medical evidence required by SSR 12-2p, not just

forfeited."); Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (same); Norton v. Sam's Club, 145 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal.").

on the diagnoses of her treating physicians. Since House failed to provide evidence demonstrating the SSR's required criteria, and because the evidence provided by Dr. Magurno negates them, <u>see</u> R. at 567, a diagnosis alone cannot support a finding that her fibromyalgia is medically determinable.

House also argues that ALJ Pitts was required to give controlling weight to Dr. Harris's fibromyalgia diagnosis under the treating physician rule. Pl.'s Br. at 21–22. Under this rule, "the ALJ must give controlling weight to the treating physician's opinion when the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." <u>Flagg v. Astrue</u>, No. 11-CV-458, 2012 WL 3886202, at *10 (N.D.N.Y. Sept. 6, 2012) (Kahn, J.) (citing 20 C.F.R. § 404.1527(d)(2); <u>Halloran v. Barnhart</u>, 362 F.3d 28, 31–32 (2d Cir. 2004)). Even if an ALJ properly declines to give controlling weight to a treating physician's opinion, she must still weigh several factors in determining what weight to give that evidence. <u>Id.</u> (citing 20 C.F.R. § 404.1527(c)(2); <u>Shaw v. Chater</u>, 221 F.3d 126, 134 (2d Cir. 2000)).

In this case, however, House's claim that the ALJ failed to give Dr. Harris's opinion the required weight cannot permit reversal of the decision below. This is because the ALJ's finding that House's fibromyalgia was medically indeterminable was not in spite of, but rather supported by, Dr. Harris's notes and opinions. As noted above, a medical report completed by NP Jumalon on February 26, 2014, and signed by Dr. Harris about one month later, omitted fibromyalgia from the list of House's diagnoses. R. at 683. It also referenced NP Jumalon's notes for the relevant clinical findings, and those notes state that on the date of the report, House had "no significant tender points" and that fibromyalgia was only "a possible diagnosis." <u>Id.</u> at 682–83; <u>cf.</u> <u>Godin v.</u>

Astrue, No. 11-CV-881, 2013 WL 1246791, at *2 (D. Conn. Mar. 27, 2013) (considering a nurse's notes that were cosigned by a medical doctor to come from an acceptable medical source). While Dr. Harris found that House met a diagnosis of fibromyalgia "as per the American Academy of Rheumatology" in December 2009 and February 2010, id. at 517, 519, he did not repeat this finding in any subsequent notes, id. at 510–16. Most importantly, Dr. Harris's notes and reports never established the existence of the eleven tender points required by SSR 12-2p to show a medically determinable diagnosis for fibromyalgia, and as such, the weight provided to Dr. Harris's opinions by ALJ Pitts on this point is irrelevant. See, e.g., Higgins v. Colvin, No. 12-CV-1379, 2014 WL 4060011, at *10 (N.D.N.Y. Aug. 14, 2014) (Kahn, J.) (noting that failure to provide appropriate weight to a treating physician's opinion is harmless error "if 'an analysis of weight by the ALJ would not have affected the outcome'" (quoting Ryan v. Astrue, 650 F. Supp. 2d 207, 217 (N.D.N.Y. 2009) (Kahn, J.))).

Furthermore, the portion of the ALJ's opinion cited to by House as showing that he afforded "little weight" to Dr. Harris's findings, see Pl.'s Br. at 21 (quoting R. at 128), had nothing to do with the medical determinability of House's fibromyalgia diagnosis, and only related to House's RFC, see R. at 126–30. For all of these reasons, the ALJ's decision that House's fibromyalgia was not medically determinable is affirmed.

### 2. Carpal Tunnel Syndrome

Similar to the claim of fibromyalgia, ALJ Pitts found that House had failed to demonstrate a medically determinable impairment of carpal tunnel syndrome. Id. at 118–19. In support of this finding, the ALJ noted that House herself "acknowledged that the etiology of her complaints [concerning her right hand] have not yet been identified." Id. at 119. He also stated

that "EMG and nerve conduction studies . . . indicated early carpal tunnel syndrome involvement and mild compression with demyelination, but none of the acceptable medical sources confirmed a diagnosis for carpal tunnel syndrome or other neurological disorder related to numbness in her hands." Id. (citation omitted). Furthermore, of the two tests conducted for carpal tunnel syndrome, one was equivocal and the other was negative. Id.

In her brief, House points to several portions of the record that she claims required a finding that her carpal tunnel syndrome was medically determinable. See Pl.'s Br. at 18. Further review shows, however, that this evidence cannot disrupt the ALJ's finding. For example, House claims that "Dr. Harris found a positive Phalen's Test," id., but this is incorrect on two points. First, it was NP Jumalon—not Dr. Harris—who made the finding, see R. at 505–06, and a nurse practitioner is not an acceptable medical source who can provide evidence of a medically determinable impairment, see 20 C.F.R. § 404.1513(a). Second, NP Jumalon said that House exhibited a "somewhat positive" Phalen's test, but a negative Tinel's test. R. at 506. This equivocal finding—discussed by the ALJ in his decision—does not serve to negate the evidence (or absence thereof) cited by the ALJ. See Gaugette v. Colvin, No. 14-CV-70, 2015 WL 6000258, at *6 (D. Vt. Oct. 14, 2015) (finding the absence of a proper diagnosis for carpal tunnel syndrome to be substantial evidence supporting a finding that there was no medically determinable impairment). The same can be said for Dr. Scott's note of "early carpal tunnel syndrom involvement" and provision of a wrist brace, R. at 776, and Dr. Magurno's note that House's right hand grip strength was 4/5, R. at 567. Since the ALJ's decision regarding the medical determinability of House's carpal tunnel syndrome is supported by substantial evidence, it must be affirmed.

### 3. Migraines and Headaches

House also complains of the ALJ's step two determination concerning her migraines and headaches. Pl.'s Br. at 19. According to House, "[t]he ALJ did not dispute the fact that she had migraines, nor their frequency or severity," but instead—without substantial evidence—concluded that her headaches/migraines represented only a slight abnormality with no more than a minimal effect on [House's] ability to perform work." Id.

This argument inaccurately portrays the ALJ's ruling on this issue. The ALJ did not "dismiss[]" the physicians' diagnoses of migraines, as House argues in her brief. Id. at 21. Rather, ALJ Pitts found that House's migraines were a medically determinable impairment, but that they were not severe under the meaning of applicable regulations. See R. at 116–17; see also 20 C.F.R. § 416.921 (defining non-severe impairments). While Dr. Magurno—a nontreating physician—did note House's history of migraines and that they could cause "moderate schedule disruptions," R. at 564, 568, it was not unreasonable for the ALJ to rely on other evidence to determine that House's migraines did not constitute a severe impairment.

As mentioned above, many of House's medical reports note the absence of migraine symptoms, and House denied headaches and migraines at many of her visits with medical personnel. See R. at 437, 439, 755, 758, 762. In concluding that House's migraines were not severe, the ALJ also noted that House's complaints of migraines extended back to the period in which she was gainfully employed, R. at 117, 564; see Reynolds v. Colvin, 570 F. App'x 45, 47 (2d Cir. 2014) (noting that the claimant's gainful activity after her complaint of an impairment "mak[es] it difficult to infer severe impairment"), and that she treated her headaches using only ibuprofen, R. at 117, 316. While House argues that the ALJ ignored the fact that her migraines

could have worsened because of her recently increased pain from fibromyalgia, Pl.'s Br. at 19, House in turn ignores the evidence in the record showing a lack of migraine complaints and a denial of migraines well after the increased pain she complains of, <u>see, e.g.</u>, R. at 439, 755, 762.

Finally, Dr. Magurno, as a nontreating source, is not entitled to controlling weight under the treating physician rule, 20 C.F.R. § 404.1527(c)(2), and House did not point to any finding of Dr. Harris or of any other treating physician concerning migraines that was disregarded by the ALJ, <u>see</u> Pl.'s Br. at 19–23. For all of these reasons, the ALJ's finding that House's migraines did not constitute a severe impairment is affirmed.

### B. Plaintiff's RFC

House also claims that ALJ Pitts erred in his determination of her RFC (and by extension, his later determination that she was capable of work). Pl.'s Br. at 23–25. The specific part of the RFC that House challenges is the ALJ's "conclusion that [House] can remain on task and at the work station despite [her] need to periodically shift from sitting to standing." <u>Id.</u> at 24; <u>see also</u> R. at 122 (stating House's RFC). According to House, the ALJ erred because he "cited no evidence supporting the assertion that 'she can stay on task' despite changing position every 30–45 minutes due to pain" and because he failed to reconcile this statement with House's general difficulty concentrating. Pl.'s Br. at 24 (citing R. at 122).

The primary basis for House's argument is the report of a consulting psychologist, Dr. Christina Caldwell, who noted that House's attention and concentration were "[m]ildly impared," as evidenced by her inability to count backward by three (i.e., "serial 3s"), even though House retained the ability to "complete[] simple calculations." R. at 542. In conclusion, Dr. Caldwell stated that House "is able to follow and understand simple directions and instructions," and that

"[s]he has a limited ability to . . . maintain attention and concentration." Id. at 543. In addition to

Dr. Caldwell's opinion, consultative examiner Dr. M. Marks[2] stated that House was moderately

limited in her "ability to maintain attention and concentration for extended periods," as well as in

her ability to complete a normal workday without interruption and to perform at a consistent

pace. Id. at 559–60. Marks also noted that House exhibited "short-term memory/concentration

problems," but ultimately opined that she was "capable of completing simple work tasks." Id.

at 561.

House's argument fails for two reasons. First, House argues that the ALJ failed to cite

sufficient evidence for his statement in the RFC (and the associated hypothetical to the

vocational expert) that House could remain on task and at the work station despite her periodic

sitting and standing. Pl.'s Br. at 24. It is the burden of the claimant, however, to establish the

facts necessary to include limitations within an RFC. See, e.g., Stanton v. Astrue, 370 F. App'x

231, 234 (2d Cir. 2010) (holding that claimant "bore the burden" of establishing the onset dates

of her impairment for an RFC determination); Poupore, 566 F.3d at 306 ("[The Commissioner]

need not provide additional evidence of the claimant's residual functional capacity."); Taylor v.

Astrue, No. 09-CV-1049, 2010 WL 7865031, at *12 (D. Conn. Aug. 31, 2010) ("The burden of

establishing a[n] RFC rests with the plaintiff."); Kirton v. Astrue, No. 06-CV-4080, 2009 WL

2252092, at *7 (S.D.N.Y. July 28, 2009) (same); see also 20 C.F.R. § 404.1545(a)(3) ("In

general, you are responsible for providing the evidence we will use to make a finding about your

residual functional capacity."). ALJ Pitts's statement that House could remain at the work station

and on task is essentially a statement that no additional impairment—namely, the inability to

---

[2]  Marks's full name is unclear from the Record. See, e.g., R. at 130.

continue working when switching positions—had been established by House. The ALJ was not obligated to prove a lack of limitations, and as such, House's argument on this point is not well taken.

Second, House claims that the ALJ ignored the psychological consultative examiner's report and other evidence concerning House's inability to concentrate, Pl.'s Br. at 24, but this is not the case. Just a few pages later in his decision, ALJ Pitts cites significant amounts of evidence in concluding that "[t]he record does not support more than moderate difficulties in maintaining concentration." R. at 131; see also, e.g., id. at 312, 542. Additionally, the ALJ took note of the opinion of Dr. Caldwell, which House now relies on, and granted it little weight—in large part due to its conflict with other evidence in the record. Id. at 132. House did not challenge this finding on appeal. See Pl.'s Br. at 23–25. The limited evidence cited by House in support of her claim that she cannot concentrate due to her need to change positions, see id. at 24–25, when viewed alongside the contrary evidence, see R. at 131, cannot have compelled the ALJ to find that House was incapable of remaining on task and at her work station while also changing positions. Even if the burden on this point was with the ALJ (which it was not), the evidence cited by ALJ Pitts in support of his finding that House had "[no] more than moderate difficulties in maintaining concentration" is enough to survive the Court's limited appellate review. See Sixberry, 2013 WL 5310209, at *3 (noting that, on substantial evidence review, "this Court must afford the Commissioner's determination considerable deference").

While there *may* have been a treating-physician-rule issue concerning the ALJ's omission of House's right hand limitations from his RFC, see R. at 686 (noting right hand limitations that were not included in the RFC), House did not raise this issue on appeal, see Pl.'s Br. at 23–25.

As discussed earlier, arguments not raised in a party's brief are waived. <u>See, e.g.</u>, <u>Whipple</u>, 479

F. App'x at 370; <u>Poupore</u>, 566 F.3d at 306; <u>Norton</u>, 145 F.3d at 117. Therefore, the Court affirms

the decision of the ALJ as to House's RFC.

## V.    CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the decision of the Commissioner in this case is **AFFIRMED**; and it is

further

**ORDERED**, that the Clerk of the Court shall serve a copy of this Memorandum-Decision

and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**


DATED:        August 12, 2016
              Albany, New York


Lawrence E. Kahn
U.S. District Judge